**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | |
|---|---|
| TODD JANSON, GERALD T. ARDREY, CHAD M. FERRELL, and C & J REMODELING LLC, on behalf of themselves and all others similarly situated, )<br><br>Plaintiffs,<br><br>v.<br><br>LEGALZOOM.COM, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>) Case No. 2:10-CV-04018-NKL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

Before the Court are the Motion for Summary Judgment [Doc. # 100] filed by Defendant LegalZoom.com, Inc. ("LegalZoom"), as well as the Motion for Partial Summary Judgment [Doc. # 88], Motion to Exclude Expert Testimony [Doc. # 86], and Motion to Strike [Doc. # 114] filed by the representative Plaintiffs in this class action. For the following reasons, the Court grants LegalZoom's Motion for Summary Judgment with respect to Plaintiffs' claims as they relate to patent and trademark applications and denies it in all other respects. The Court also grants Plaintiffs' Motion for Partial Summary Judgment and denies the Motion to Strike and the Motion to Exclude Expert Testimony as they relate to the Motion for Summary Judgment.

**I.       Background**

## A.     Relevant Uncontroverted Facts[1]

LegalZoom is a privately held corporation with its principal place of business in California.  LegalZoom maintains a website – www.legalzoom.com – which offers online legal document forms and services.

First, LegalZoom's website offers blank legal forms that customers may download, print, and fill in themselves.  Among the blank legal forms customers may download from the LegalZoom website are affidavits, bills of sale, letters, releases, promissory notes, and various types of agreements.  Plaintiffs make no claim with respect to these blank legal forms that customers may download, print, and fill-in themselves.

In addition to such blank forms, LegalZoom's website also offers an internet portal, which is the subject of this dispute.  With respect to the services offered through the internet portal, LegalZoom has aired a television advertisement stating:

> Over a million people have discovered how easy it is to use LegalZoom for important legal documents, and LegalZoom will help you incorporate your business, file a patent, make a will and more.  You can complete our online questions in minutes.  Then we'll prepare your legal documents and deliver them directly to you.

[Doc. # 119 at 51.]  Another LegalZoom advertisement states:

> Log on to LegalZoom.com and check out filing incorporation papers for a new business.  Click the tab marked "Incorporations, LLCs and DBAs."   Then click the "get started" button, and you're in.  Just answer a few simple online questions and LegalZoom takes over.  You get a quality legal document filed for you by real helpful people.

---

[1]  The Court has considered the parties' statements of undisputed fact which are supported by evidence.  The Court has drawn all inferences in favor of the non-movant.

*Id.* at 52.  These advertisements also contain LegalZoom's disclaimer:  "LegalZoom isn't a law firm.  They provide self-help services at your specific direction."  *Id.*

Among the legal documents available through LegalZoom's internet portal are business formation documents, estate planning documents, pet protection agreements, and copyright, trademark, and patent applications.  After making an initial selection, the customer enters answers to questions via a "branching intake mechanism" (or decision tree), referred to on the website as an "online questionnaire."  Customers type in answers to the questions contained in the online questionnaire.  In some cases, customers select an alternative from a list of choices or checkboxes provided by LegalZoom.  The branching mechanism skips questions for sections of the questionnaire that are inapplicable based on the customer's prior answers.  For example, the questionnaire for a last will and testament asks if the customer has children; if the customer's answer is "no," questions about the customer's children are skipped and the customer is taken to a different next question than if the customer's answer had been "yes."

The online questionnaire process is fully automated.  No LegalZoom employee offers or gives personal guidance on answering the questions, although information relevant to the customer's choice sometimes appears on the screen.  For example, when completing the questionnaire to purchase a last will and testament, a question appears:  "Would you like to protect your personal representative from liability?"  After the question, there appears on the screen: "How did most people answer this question?" followed by "yes."

When the customer has completed the online questionnaire, LegalZoom's software creates a completed data file containing the customer's responses. A LegalZoom employee then reviews that data file for completeness, spelling and grammatical errors, and consistency of names, addresses, and other factual information. If the employee spots a factual error or inconsistency, the customer is contacted and may choose to correct or clarify the answer.

After the review of the data file, LegalZoom's software automatically enters the information provided by the customer via the online questionnaire into the LegalZoom template that corresponds with the type of document sought by the customer. LegalZoom's templates include standardized language created by attorneys (licensed outside the state of Missouri) to apply to common consumer and business situations. The software also removes sections of the template that are inapplicable based on the customer's answers to the questionnaire. For instance, if a customer has answered that she has no children in responding to the online questionnaire for a last will, no provisions for bequests to children are included in the final document. All information entered by a customer (other than payment and shipping) is used by the software to fill in LegalZoom's template. In other words, the software does not edit or select from the information entered by the customer.

After the customer's data has been input into the template, a LegalZoom employee reviews the final document for quality in formatting – e.g., correcting word processing "widows," "orphans," page breaks, and the like. The employee then prints and ships the final, unsigned document to the customer. In rare cases, upon request, the document is emailed to the customer. A customer does not see the purchased document until

it is delivered. All Missouri customers who select a given document and provide the same information will receive an identical final product.

After receiving the document, the customer may review, sign, execute, and use the final document at his convenience. The customer may take the unexecuted document to an attorney for review and choose not to use the document at all. Under LegalZoom's refund policy, customers can obtain a full refund (less charges paid to third parties for filing fees or other costs) for 60 days after their transaction if they are not satisfied.

With respect to some of the intellectual property documents, LegalZoom files the government document for the customer based on the customer's answers to the questionnaire. For example, a copyright application is completed using the information gathered through the customer's answers to the questionnaire and then uploaded directly from LegalZoom to the appropriate government office. In the copyright example, the customer will also, at the time of the application or later, send LegalZoom the work for which copyright protection is sought, and LegalZoom will also provide that material to the appropriate government office for the customer. At the time the copyright application is submitted to the appropriate government office by LegalZoom for the customer, LegalZoom reviews the entire submission to make sure it complies with what the customer wished to copyright as set forth in the answers provided to the questionnaire. Similarly, there are two different methods by which a person may create a trademark. LegalZoom determines the trademark-registration method after the customer that selected a trademark document answers questions in the branching questionnaire developed by LegalZoom for the trademark process. Like a

copyright application, the customer never sees the trademark application before it is uploaded to the government office by LegalZoom. For documents in the business-services division, LegalZoom also determines what particular government document to use based on the consumer's answers to the questionnaires.

Limited customer service is available to LegalZoom customers by email and telephone. LegalZoom customer-service representatives receive training concerning the company's policy against providing legal advice and are regularly instructed not to recommend forms or documents or give any legal advice. LegalZoom customer-service representatives are repeatedly informed that giving legal advice to a customer will result in dismissal, and that even approaching giving legal advice to a customer will result in discipline up to and including dismissal.

The named Plaintiffs had no personal interaction with any LegalZoom employee while using the LegalZoom website or afterward. The named Plaintiffs never believed that they were receiving legal advice while using the LegalZoom website. Plaintiff Todd Janson paid LegalZoom $121.95 for his will, while Plaintiffs Gerald Ardrey and Chad Ferrell paid LegalZoom $249 for the articles of organization of Plaintiff C & J Remodeling.

## B.    Procedural History

This action was removed to federal court on February 5, 2010. Plaintiffs' Amended Petition contains four counts. [Doc. # 1, Ex. 1 at 8.] Count I asserts a claim for unlawful practice of law pursuant to Mo. Rev. Stat. § 484.020. Count II asserts a claim for money had and received, under the theory that the money paid by Plaintiffs to LegalZoom "was not used

for their benefit because LegalZoom is not authorized to engage in the lawful practice of law in the State of Missouri." *Id.* at ¶ 42. Count III asserts a claim under the Missouri Merchandising Practices Act ("MPA") and seeks money damages, while Count IV asserts a Missouri MPA claim seeking injunctive relief to bar LegalZoom from collecting money from its Missouri customers.

On June 1, 2010, the Court denied Defendant LegalZoom's Motion to Dismiss for Improper Venue. [Doc. # 29.] On July 27, 2010, the Court denied Defendant's Motion to Reconsider or, in the Alternative, to Transfer Venue. [Doc. # 40.]

On December 14, 2010, the Court certified the following class: "All persons and other entities resident within the State of Missouri who were charged and paid fees to LegalZoom for the preparation of legal documents from December 17, 2004 to the present." [Doc. # 61.] In certifying the class, the Court noted that Plaintiffs did not argue that any of Defendant's legal documents were in any way flawed. Rather, Plaintiffs stated that the "overarching issue is whether LegalZoom's preparation of legal documents violates Missouri law." [Doc. # 57 at 1.]

## II.     Discussion

### A.     Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its

motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

### B.    Missouri's Unauthorized Practice of Law Statute

As Plaintiffs have stated, the overarching issue in this case is whether Defendant LegalZoom has violated Missouri law by engaging in the unauthorized practice of law. Section 484.020 provides:

> 1. No person shall engage in the practice of law or do law business, as defined in section 484.010, unless he shall have been duly licensed therefor . . . .
>
> 2. Any person, association, partnership, limited liability company or corporation who shall violate the foregoing prohibition of this section shall be guilty of a misdemeanor and upon conviction therefor shall be punished by a fine not exceeding one hundred dollars and costs of prosecution and shall be subject to be sued for treble the amount which shall have been paid him or it for any service rendered in violation hereof by the person, firm, association, partnership, limited liability company or corporation paying the same within two years from the date the same shall have been paid and if within said time such person, firm, association, partnership, limited liability company or corporation shall neglect and fail to sue for or recover such treble amount, then

the state of Missouri shall have the right to and shall sue for such treble amount and recover the same and upon the recovery thereof such treble amount shall be paid into the treasury of the state of Missouri.

Mo. Rev. Stat. § 484.020.   Section 484.010 provides:

> 1. The "practice of the law" is hereby defined to be and is the appearance as an advocate in a representative capacity or the drawing of papers, pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or prospective before any court of record, commissioner, referee or any body, board, committee or commission constituted by law or having authority to settle controversies.

> 2. The "law business" is hereby defined to be and is the advising or counseling for a valuable consideration of any person, firm, association, or corporation as to any secular law or the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights or the doing of any act for a valuable consideration in a representative capacity, obtaining or tending to obtain or securing or tending to secure for any person, firm, association or corporation any property or property rights whatsoever.

Mo. Rev. Stat. §  484.010.

This Court is bound to apply the decisions of the Missouri Supreme Court regarding substantive issues in a diversity case controlled by Missouri law.  *See Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005).  Here, the Court must interpret Missouri's unauthorized practice of law statute as would the Missouri Supreme Court.

**C.      The Missouri Supreme Court's Interpretation of the Unauthorized Practice of Law**

The Missouri Supreme Court has repeatedly emphasized that the "judicial branch of government has the power to regulate the practice of law." *In re Thompson*, 547 S.W.2d 365, 366 (Mo. 1978) (en banc) (citing *In re Richards*, 63 S.W.2d 672 (Mo. 1933) (en banc)).

When applying Missouri's unauthorized practice of law statute, the Missouri Supreme Court has written:

> This [statutory] definition of "law business" . . . . is adequate for the issue before us, [but] it should also be noted that it is impossible to lay down an exhaustive definition of "the practice of law." . . . In any event, the General Assembly may only *assist* the judiciary by providing penalties for the unauthorized practice of law, the ultimate definition of which is always within the province of this Court.

*In re First Escrow, Inc.*, 840 S.W.2d 839, 843 n.6, 7 (Mo. 1992) (en banc) (internal quotations and citations omitted). Thus, to apply Missouri's unauthorized practice of law statute, this Court must decide whether LegalZoom's conduct fits within the Missouri Supreme Court's definition of the unauthorized practice of law.

### 1. *Hulse* and *Thompson*

Two foundational cases are cited throughout the Missouri Supreme Court's jurisprudence on the unauthorized practice of law. Plaintiffs urge the Court to follow the cases that apply *Hulse v. Criger*, 247 S.W.2d 855 (Mo. 1952) (en banc), which generally involve businesses providing a legal document preparation service for their customers. Meanwhile, Defendant LegalZoom argues that its website providing access to online document assembly software is the functional equivalent of the "do-it-yourself" divorce kit approved for sale by the Missouri Supreme Court in *Thompson*, 547 S.W.2d at 366.

In 1952, the Missouri Supreme Court decided *Hulse*, explaining that its regulation of the unauthorized practice of law "is not to protect the Bar from competition but to protect the

public from being advised or represented in legal matters by incompetent or unreliable persons." *Hulse*, 247 S.W.2d at 857-58. In *Hulse*:

> Respondent admit[ted] that in numerous transactions in the general and ordinary course of his business as a licensed real estate broker and incidental thereto, respondent . . . has prepared for persons other than himself, many instruments relating to and affecting real estate and the title to real estate, including deeds conveying real estate, deeds of trust and mortgages encumbering real estate, promissory notes secured by such deeds of trust or mortgages; leases of real estate, options for purchase, contracts of sale and agreements.
> . . .
> Respondent also admit[ted] that [he] . . . customarily in each instance conferred with one or more of the parties to the transaction . . . elicit[ing] in such conference what were considered to be the pertinent facts . . . .

*Id.* at 856-57 (internal quotation omitted). In other words, customers provided the defendant with information that would allow him to prepare their legal documents, which were ancillary to his real estate business. Indeed, the defendant in *Hulse* had argued that "preparing and completing instruments necessary to the closing of real estate transactions is one of the most important services performed by realtors . . . ." *Id.* at 857. *Hulse* concluded that realtors could perform such a legal document preparation service for customers, but only when ancillary to their main business, and only if they did not charge a separate fee for that service. *Id.* at 862.

*Thompson*, in contrast, concerned an Oregon resident sending "do-it-yourself" divorce kits to franchisees in Missouri:

> The "Divorce Kits" offered for sale in this state consist of a packet approximately one-fourth inch in thickness. Much of the kit consists of various forms pertaining to an action for an uncontested dissolution of marriage. Blank spaces, with instructions on practice forms, are provided for

the insertion of specific items applicable to the parties involved in the dissolution. These forms include two forms for a petition for dissolution of marriage, one a "joint" petition, and one an individual petition, as well as other forms including affidavits of nonmilitary service, waivers of notice of hearing, affidavits needed to obtain service by publication, financial statements, and a decree form. These forms are accompanied by two kinds of instructions, a set of general procedural instructions designed to instruct as to what forms to file, in what order and where, and instructions on how to prepare the forms.

*Thompson*, 574 S.W.2d at 366.

*Thompson* began by summarizing *Hulse* – finding it "generally applicable" – but ultimately looked beyond Missouri for cases decided on analogous facts: "Other jurisdictions have decided cases directly on point and are more persuasive however in light of recent United States Supreme Court cases decided after *Hulse*." *Id.* at 367 (citing, inter alia, *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975) (finding that attorney fee schedules constituted price-fixing under the Sherman Act); *Faretta v. California*, 422 U.S. 806 (1975) (affirming the right of pro se representation)).

*Thompson* relied most heavily on the Florida Supreme Court's reasoning in *Florida Bar v. Brumbaugh*, 355 So.2d 1186 (Fla. 1978).[2] *Thompson* quoted *Brumbaugh*'s holding as follows:

We hold that Ms. Brumbaugh, and others in similar situations, may sell printed material purporting to explain legal practice and procedure to the public in general and she may sell sample legal forms. . . . In addition, Ms. Brumbaugh may advertise her business activities of providing secretarial and notary

---

[2] At least one prominent Legal Profession casebook uses *Brumbaugh* as the leading case on the unauthorized practice of law. *See* Andrew L. Kaufman & David B. Wilkins, *Problems in Professional Responsibility for a Changing Profession* 590-97 (5th ed. 2009) (also noting that the "Florida Supreme Court has revisited and consistently followed the *Brumbaugh* approach many times" (citation omitted)).

> services and selling legal forms and general printed information. However, Marilyn Brumbaugh must not, in conjunction with her business, engage in advising clients as to the various remedies available to them, or otherwise assist them in preparing those forms necessary for a dissolution proceeding.

*Thompson*, 574 S.W.2d at 368 (quoting *Brumbaugh*, 355 So.2d at 1194). The Florida

Supreme Court had further concluded:

> Although Marilyn Brumbaugh never held herself out as an attorney, it is clear that her clients placed some reliance upon her to properly prepare the necessary legal forms for their dissolution proceedings. To this extent we believe that Ms. Brumbaugh overstepped proper bounds and engaged in the unauthorized practice of law. . . . While Marilyn Brumbaugh may legally sell forms . . . and type up instruments which have been completed by clients, she must not engage in personal legal assistance in conjunction with her business activities, including the correction of errors and omissions.

*Brumbaugh*, 355 So.2d at 1193-94. While *Thompson* did not involve notary services of any

kind, it reached a similar conclusion as *Brumbaugh* with respect to the sale of legal self-help

goods: "[T]he advertisement and sale by the respondents of the divorce kits does not

constitute the unauthorized practice of law so long as the respondents and other[s] similarly

situated refrain from giving personal advice as to legal remedies or the consequences flowing

therefrom." *Thompson*, 574 S.W.2d at 369. Thus, it became the law in Missouri, as it is in

other jurisdictions, that the practice of law does not include the sale of "do-it-yourself" kits,

which include blank legal forms and general instructions.

## 2. Subsequent Cases

In 1992, the Missouri Supreme Court decided *First Escrow*, which involved two

escrow companies that provided "real estate closing or settlement services":

> [Defendant escrow companies] complete pre-printed forms of documents, including but not limited to general warranty deeds, corporation warranty deeds, quit claim deeds, promissory notes, deeds of trust, affidavits of possession and title, HUD settlement statements and receipts, IRS Forms 1099, and property inspection certificates. [Defendants] discern the information needed to complete these forms from the written real estate contract and from communications with the parties and any attorneys, title insurers, or lenders involved in the transaction.

*First Escrow*, 840 S.W.2d at 841. *First Escrow* applied the principles laid out in *Hulse*:

> [T]he *Hulse* Court rested its decision upon two grounds. First, that the transactions involved were "simple enough so that such a [standardized] form will suffice," and second, that the broker had sufficient identity of interest with the seller he represented to safeguard the proper completion of the transaction.
>
> The situation presented here regarding escrow companies, however, does not fall within the *Hulse* exception. While the relatively simple nature of the task of filling in form documents remains unchanged, and while the completion of these documents may be "incidental" to the closing process, the escrow company does not have the requisite personal financial interest to safeguard the transaction.

*Id.* at 844 (citation and footnote omitted). However, the finding that the person filling in the document for the customer could have adverse interests was not the end of the analysis:

> Nonetheless, we are reluctant to automatically brand respondents' activities as the unauthorized doing of law business. *Hulse* established our duty to strike a workable balance between the public's protection and the public's convenience.
> . . .
> In short, we are willing to allow the *Hulse* test to be expanded to permit escrow companies to fill in the blanks of certain standardized form documents required to close real estate transactions only if they do so under the supervision of, and as agents for, a real estate broker, a mortgage lender, or a title insurer who has a direct financial interest in the transaction.

*Id.* at 844, 846-47.  Still, the Missouri Supreme Court held that escrow companies "may not prepare or complete nonstandard or specialized documents" and "may not charge a separate fee for document preparation . . . ."  *Id.* at 848-49.

In 1996, the Missouri Supreme Court decided *In re Mid-America Living Trust Associates, Inc.*, 927 S.W.2d 855 (Mo. 1996) (en banc).  The Court first reaffirmed the rules in *Hulse* and *Thompson*:

> We allow non-attorneys to perform routine services, ancillary to other valid activities and without compensation, such as the filling in of blanks in approved form real estate documents.  *Hulse*, 247 S.W.2d at 862; *In re First Escrow, Inc.*, 840 S.W.2d at 846.  Also, non-attorneys may sell *generalized* legal publications and "kits", so long as no "personal advice as to the legal remedies or consequences flowing therefrom" is given.  *In re Thompson*, 574 S.W.2d at 369.

*Id.* at 859.  Under *Mid-America*'s facts, the Missouri Supreme Court found that the defendant's "trust associates" had engaged in the unauthorized practice of law:

> This is not a situation such as in *In re Thompson* where a generalized "kit" was sold.  Instead, specific individuals were solicited and Mid-America's trusts were recommended and sold to them for valuable consideration as estate planning devices.
> . . .
> The trust associates were not merely collecting information to fill in standardized forms as otherwise might have been approved by *Hulse* and *In re First Escrow*.  Instead, they also were giving legal advice to the clients about choices to be made and the legal effects of those choices.
> . . .
> In *Hulse* and *In re First Escrow*, we held that non-attorneys could properly fill in blanks in standard real estate forms when they performed such a service *without compensation* and ancillary to other valid duties.  Mid–America does not fall within this exception.  The documents sold are not standardized forms accepted generally within a particular business or industry, but propriety documents unique to Mid–America. Mid–America markets, drafts, and

executes customized legal documents *for compensation*. This service is not ancillary to any other valid business, but is the end business itself.

*Id.* at 864-65 (citations omitted).

Most recently, in 2007, the Missouri Supreme Court decided *Eisel v. Midwest Bankcentre*, 230 S.W.3d 335 (Mo. 2007) (en banc). There, the defendant bank had charged a separate fee for preparing legal documents for its customers, in violation of the rules laid out in *Hulse* and reaffirmed in *Mid-America*. The Missouri Supreme Court wasted little time in affirming the judgment against the bank under Missouri's unauthorized practice of law statute:

> This Court has prohibited a company and its non-lawyer agents, servants, employees, and trust associates from drawing, preparing, or assisting in the preparation of trust workbooks, trusts, wills, and powers of attorney, for valuable consideration, for Missouri residents without the direct supervision of an independent licensed attorney selected by and representing those individuals. *In re Mid-America Living Trust Associates, Inc.*, 927 S.W.2d 855, 871 (Mo. banc 1996). Escrow companies may not charge a separate fee for document preparation or vary their customary charges for closing services based upon whether documents are to be prepared in the transaction. *In re First Escrow, Inc.*, 840 S.W.2d 839, 849 (Mo. banc 1992). Similarly, this Court noted that the charging of a separate additional charge tends to place emphasis on conveyancing and legal drafting as a business rather than on the business of being a real estate broker. *Hulse* at 863. With respect to [defendant], no conflict exists between section 484.020 and this Court's regulation of the practice of law.

*Id.* at 339; *see also Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697 (Mo. 2008) (en banc) (related case reaffirming *Eisel*).

### 3.    Application of Missouri Law to LegalZoom's Conduct

In its Motion for Summary Judgment, Defendant LegalZoom argues that, as a matter of law, it did not engage in the unauthorized practice of law in Missouri. Thus, the Court must decide whether a reasonable juror could conclude that LegalZoom did engage in the unauthorized practice of law, as it has been defined by the Missouri Supreme Court. *See First Escrow*, 840 S.W.2d at 843 n.7 ("the General Assembly may only *assist* the judiciary by providing penalties for the unauthorized practice of law, the ultimate definition of which is always within the province of this Court"); *Eisel,* 230 S.W.3d at 338-39 (reaffirming that "[t]he judiciary is necessarily the sole arbiter of what constitutes the practice of law," and finding no conflict between § 484.020 and the Missouri judiciary's regulation of the practice of law).

Plaintiffs argue that the Missouri Supreme Court has declared on multiple occasions that a non-lawyer may not charge a fee for their legal document preparation service. Defendant responds that its customers – rather than LegalZoom itself – complete the standardized legal documents by entering their information via the online questionnaire to fill the document's blanks, which it concedes that customers never see. While the parties dispute the proper characterization of the underlying facts, there is no dispute regarding how LegalZoom's legal document service functions.

It is uncontroverted that Defendant LegalZoom's website performs two distinct functions. First, the website offers blank legal forms that customers may download, print, and fill in themselves. Plaintiffs make no claim regarding these blank forms. Indeed, this function is analogous to the "do-it-yourself" kit in *Thompson* containing blank forms and

17

general instructions regarding how those forms should be completed by the customer. Such a "do-it-yourself" kit puts the legal forms into the hands of the customers, facilitating the right to pro se representation.

It is the second function of LegalZoom's website that goes beyond mere general instruction. LegalZoom's internet portal is not like the "do-it-yourself" divorce kit in *Thompson*. Rather, LegalZoom's internet portal service is based on the opposite notion: we'll do it for you. Although the named Plaintiffs never believed that they were receiving legal advice while using the LegalZoom website, LegalZoom's advertisements shed some light on the manner in which LegalZoom takes legal problems out of its customers' hands. While stating that it is not a "law firm" (yet "provide[s] self-help services"), LegalZoom reassures consumers that "we'll prepare your legal documents," and that "LegalZoom takes over" once customers "answer a few simple online questions." [Doc. # 119 at 51-52.]

None of the Missouri Supreme Court cases cited by the parties are directly on point, due to the novelty of the technology at issue here. However, the weight of the authority that does exist indicates that businesses may not charge fees for a legal document preparation service, although they may sell goods – including blank forms and general instructions – to facilitate the consumer's own preparation of legal documents. The "do-it-yourself" divorce kit in *Thompson*, upon which Defendant relies so heavily, was not a service but purely a product. *Thompson* did not even address the question of document preparation in *Thompson* because the issue was not before it - the purchaser of the kit prepared the document, not the company that sold the kit.

*Thompson* relied heavily on *Brumbaugh*, where the Florida Supreme Court allowed not only the sale of self-help legal goods, but also allowed for parallel notary services. Nonetheless, *Brumbaugh* held that the notary could only "type up instruments which have been completed by clients," and could not "assist them in preparing those forms" or otherwise "engage in personal legal assistance in conjunction with her business activities, including the correction of errors and omissions." *Brumbaugh*, 355 So.2d at 1194. LegalZoom also cites *Colorado Bar Association v. Miles*, 557 P.2d 1202 (Colo. 1976) (en banc), as an example of the permissibility of a scrivener service related to legal documents. [Doc. # 101 at 20.] But that case affirmed the prohibition of "[p]reparing for other persons pleadings or other written instruments relating to dissolution of marriage other than in the manner performed by a scrivener or public stenographer." *Miles*, 557 P.2d at 1204. In other words, the scrivener or notary service is a limited exception to the rule that the practice of law does include legal services such as "assisting [customers] in preparing forms" and "the correction of errors or omissions." *Brumbaugh*, 355 So.2d at 1194.

Here, LegalZoom's internet portal offers consumers not a piece of self-help merchandise, but a legal document service which goes well beyond the role of a notary or public stenographer. The kit in *Thompson* offered page upon page of detailed instructions but left it to the purchaser to select the provisions applicable to their situation. The purchaser understood that it was their responsibility to get it right. In contrast, LegalZoom says: "Just answer a few simple online questions and LegalZoom takes over. You get a quality legal document filed for you by real helpful people." [Doc. # 119 at 51.] Thus, LegalZoom's

internet portal sells more than merely a good (i.e., a kit for self help) but also a service (i.e., preparing that legal document). Because those that provide that service are not authorized to practice law in Missouri, there is a clear risk of the public being served in legal matters by "incompetent or unreliable persons." *Hulse*, 247 S.W.2d at 858. "Our purpose must be to make sure that legal services required by the public, and [e]ssential to the administration of justice, will be rendered by those who have been found by investigation to be properly prepared to do so . . . ." *Id.*

That Defendant's legal document service is delivered through the internet is not the problem. The internet is merely a medium, and LegalZoom's sale of blank forms over the internet does not constitute the unauthorized practice of law. Nor would LegalZoom be engaging in the unauthorized practice of law if it sold general instructions to accompany those blank forms over the internet (as may already be the case).

LegalZoom's legal document preparation service goes beyond self-help because of the role played by its human employees, not because of the internet medium. LegalZoom employees intervene at numerous stages of the so-called "self-help services." [Doc. # 191 at 51.] First, after the customer has completed the online questionnaire, a LegalZoom employee reviews the data file for completeness, spelling and grammatical errors, and consistency of names, addresses, and other factual information. If the employee spots a factual error or inconsistency, the customer is contacted and may choose to correct or clarify the answer. Later in the process, after the reviewed information is inserted into LegalZoom's template, a LegalZoom employee reviews the final document for quality in formatting – e.g.,

correcting word processing "widows," "orphans," page breaks, and the like. Next, an employee prints and ships the final, unsigned document to the customer. Finally, customer service is available to LegalZoom customers by email and telephone.

As in *Brumbaugh*:

> Although Marilyn Brumbaugh never held herself out as an attorney, it is clear that her clients placed some reliance upon her to properly prepare the necessary legal forms . . . . To this extent we believe that Ms. Brumbaugh overstepped proper bounds and engaged in the unauthorized practice of law. . . . While Marilyn Brumbaugh may legally sell forms . . . and type up instruments which have been completed by clients, she must not engage in personal legal assistance in conjunction with her business activities, including the correction of errors and omissions.

*Brumbaugh*, 355 S.2d at 1193-94.

Furthermore, LegalZoom's branching computer program is created by a LegalZoom employee using Missouri law. It is that human input that creates the legal document. A computer sitting at a desk in California cannot prepare a legal document without a human programming it to fill in the document using legal principles derived from Missouri law that are selected for the customer based on the information provided by the customer. There is little or no difference between this and a lawyer in Missouri asking a client a series of questions and then preparing a legal document based on the answers provided and applicable Missouri law. That the Missouri lawyer may also give legal advice does not undermine the analogy because legal advice and document preparation are two different ways in which a person engages in the practice of law. *See,* Mo. Rev. Stat. § 484.010 (defining law business as giving legal advice for compensation or "assisting in the drawing for a valuable

21

consideration of any paper, document or instrument affecting or relating to secular rights"
*Id*.)

The Missouri Supreme Court cases which specifically address the issue of document preparation, *First Escrow*, *Mid-America* and *Eisel*, make it clear that this is the unauthorized practice of law. The fact that the customer communicates via computer rather than face to face or that the document is prepared using a computer program rather than a pen and paper does not change the essence of the transaction. As in *Hulse*, *First Escrow*, *Mid-America*, and *Eisel*, LegalZoom's customers are rendered passive bystanders after providing the information necessary to complete the form. Yet LegalZoom charges a fee for its legal document preparation service. Unlike *Thompson*, the customer does not have to follow directions to fill in a blank legal form. The customer merely provides information and "LegalZoom takes over." [Doc. # 119 at 52.]

**D. Defendant's Constitutional Arguments**

Defendant LegalZoom also argues that the application of Missouri law prohibiting the unauthorized practice of law to its conduct would raise constitutional issues.

**1. First Amendment**

First, Defendant argues that an interpretation of Missouri law as prohibiting its conduct would violate the First Amendment of the U.S. Constitution and Article I, § 8 of the Missouri Constitution. However, LegalZoom cites no caselaw from any jurisdiction where the application of law prohibiting the unauthorized practice of law was found to violate the First Amendment, much less Article I, § 8 of the Missouri Constitution.

LegalZoom relies primarily on a Second Circuit case finding that a self-help book containing blank forms and general instructions was protected by the First Amendment's guarantee of free speech. *Dacey v. New York County Lawyers' Ass'n*, 423 F.2d 188, 193 (2d Cir. 1969). However, the Court has already determined that LegalZoom's sale of such merchandise does not constitute the unauthorized practice of law. Thus, it is not the content of speech at issue here, as there is no dispute regarding what speech could be included in any goods sold over the internet. Rather, LegalZoom's conduct in preparing legal documents is at issue.

Moreover, LegalZoom's customers remain free to represent themselves in any court proceeding. LegalZoom has pointed to no court that has held that a right exists to receive legal services from a non-lawyer. The Supreme Court has recognized a First Amendment right to receive legal advice from duly qualified attorneys, consistent with "the State's interest in high standards of legal ethics." *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 225 (1967).

The Supreme Court has explained that a regulation imposed by the Ohio bar affecting speech involved "a subject only marginally affected with First Amendment concerns." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 459 (1978). There, the Supreme Court held that the bar could discipline a lawyer for soliciting clients under certain circumstances, even though it involved speech, noting that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.* at 456. Elsewhere, the Supreme Court has "recognize[d] that the States have

a compelling interest in the practice of professions within their boundaries," and that "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *Goldfarb*, 421 U.S. at 792 (citations omitted); *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995) (upholding direct mail restriction on lawyers).

The caselaw on this subject has been well summarized by the Colorado Supreme Court:

> In general, Colorado's ban on the unauthorized practice of law does not implicate the First Amendment because it is directed at conduct, not speech. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (suggesting that the government's regulation of the practice of law is a regulation of conduct, not speech); *S. Christian Leadership Conference v. Sup. Ct. of La.*, 252 F.3d 781, 789 (5th Cir. 2001) (finding that state prohibition on unlicensed students practicing law in state courts did not regulate speech); *Drew v. Unauthorized Practice of Law Comm.*, 970 S.W.2d 152, 155 (Tex. Ct. App. 1998) (holding that ban on unauthorized practice of law did not implicate the First Amendment); *Fla. Bar v. Furman*, 376 So.2d 378, 379 (Fla. 1979) (rejecting argument from unlicensed attorney that ban on unauthorized practice of law violated freedom of speech).

*People v. Shell*, 148 P.3d 162, 173 (Colo. 2006).

Given the weight of these authorities indicating that states have a compelling interest in the regulation of professionals for the protection of the public, as well as the paucity of authority cited by Defendant, the Court declines to alter Missouri law based on inarticulate free speech principles.

**2.     Due Process**

LegalZoom also argues that applying Missouri's unauthorized practice of law statute to its conduct would violate due process. LegalZoom argues that the statute should be construed under the rule of lenity because – in addition to providing a private right of action – it states that any person engaging in the unauthorized practice of law "shall be guilty of a misdemeanor and upon conviction therefor shall be punished by a fine not exceeding one hundred dollars and costs of prosecution . . . ." Mo. Rev. Stat. § 484.020.2.

Even when a statute is entirely penal in nature, the Eighth Circuit has explained: "[T]he rule that a penal statute is to be strictly construed in favor of persons accused, is not violated by allowing the language of the statute to have its full meaning, where that construction supports the policy and purposes of the enactment." *Wilson v. United States*, 77 F.2d 236, 239-40 (8th Cir. 1935) (citations omitted); *see also United States v. R.L.C.*, 915 F.2d 320, 325 (8th Cir. 1990) ("The rule of lenity states that a court cannot interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended." (internal quotation and citation omitted)). Moreover, a statute is presumed constitutional and is void for vagueness only where it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377, 1382 (8th Cir. 1989) (citing *Colautti v. Franklin*, 439 U.S. 379, 390 (1979)).

It is often true that past cases have not applied a statute to the particular fact pattern before a court. Here, the statute clearly prohibits the unauthorized "assisting in the drawing

for a valuable consideration of any paper, document or instrument affecting or relating to secular rights . . . ." Mo. Rev. Stat. § 484.010.2. As explained above, the application of the statute to LegalZoom's legal document preparation service does not conflict with the Missouri judiciary's regulation of the practice of law. *See Eisel*, 230 S.W.3d at 339. Additionally, cases such as *Hulse*, *First Escrow*, *Mid-America*, and *Eisel* put LegalZoom on notice that it could not charge a fee for the preparation of legal documents. Finally, the Missouri Supreme Court rejected a similar argument in *Carpenter*, 250 S.W.3d at 702 ("Countrywide has not established that sections 484.010 and 844.020 were vague and did not provide it fair notice of the prescribed acts or the penalty associated with those acts."). Here too, LegalZoom's due process argument fails.

### 3. Preemption

LegalZoom's final constitutional argument is that with respect to patent and trademark applications, Plaintiffs' claims are preempted by federal law permitting non-lawyers to practice before the Patent and Trademark Office ("PTO"). LegalZoom cites *Sperry v. Florida ex rel. Florida Bar*, 373 U.S. 379, 404 (1963), where the Supreme Court held that Florida could not enjoin a non-lawyer registered to practice before the U.S. Patent Office from preparing and prosecuting patent applications in Florida, even though such activity constituted the practice of law. There, the Supreme Court reasoned that states could not review the "federal determination that a person or agency is qualified" or otherwise "impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress." *Id.* at 385 (internal quotation omitted).

Congress has authorized the PTO to prescribe regulations "govern[ing] the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Office." 35 U.S.C. § 2(b)(2)(D). With respect to patents, 37 C.F.R. § 1.31 states that an applicant may file and prosecute his own case or "may give a power of attorney so as to be represented by one or more patent practitioners or joint inventors." A "patent practitioner" is defined to include a registered patent agent. 37 C.F.R. §§ 1.32(a), 11.6(b). The regulations authorize the PTO to allow a non-registered non-lawyer to serve as a patent agent on designated applications. 37 C.F.R. § 11.9(a). With respect to non-patent matters, the regulations also authorize non-lawyers to practice before the PTO under certain limited circumstances. *See* 37 C.F.R. § 11.14.

Plaintiffs cite *Kroll v. Finnerty*, 242 F.3d 1359 (Fed. Cir. 2001), where a patent attorney brought suit seeking a declaratory judgment that the Grievance Committee of the Bar of the State of New York lacked subject-matter jurisdiction to bring disciplinary proceedings against him for his failure to keep his clients informed as to the progress or the status of their patent applications. The attorney argued that the state bar's authority was preempted by 35 U.S.C. § 2(b)(2)(D) and 35 U.S.C. § 32, which authorize the PTO to regulate the conduct of patent practitioners. *Kroll*, 242 F.3d at 1363. The Federal Circuit found that there was no express preemption because the statutory text "gives no indication that either of these statutes are intended to preempt the authority of states to punish attorneys who violate ethical duties under state law." *Id.* at 1364. *Kroll* determined that Congress had "not intended to preempt states' authority to discipline attorneys." *Id.* The Federal Circuit

quoted the first paragraph of the PTO's regulations governing the conduct of patent practitioners:

> This part governs solely the practice of patent, trademark, and other law *before the Patent and Trademark Office. Nothing in this part shall be construed to preempt the authority of each State to regulate the practice of law*, except to the extent necessary for the Patent and Trademark Office to accomplish its Federal objectives.

*Id.* (quoting 37 C.F.R. § 10.1). *Kroll* continued:

> As for field preemption and conflict preemption, there is indeed a limited field of law where the PTO's powers under 35 U.S.C. § 2(b)(2)(D) and 35 U.S.C. § 32 do preempt state law. Under these statutes, the PTO has the exclusive authority to establish qualifications for admitting persons to practice before it, and to suspend or exclude them from practicing before it. A state, for example, may not impose additional licensing requirements beyond those required by federal law to permit a non-lawyer patent agent to practice before the PTO. . . . . In this case, because the State of New York is not seeking to suspend or expel Kroll from practicing before the PTO, the conduct of the Grievance Committee does not fall within the field of preemption outlined by *Sperry.*

*Id.* at 1364-65.

Four years later, the Federal Circuit, relying on *Sperry*, stated clearly that "state licensing requirements which purport to regulate private individuals who appear before a federal agency are invalid." *Augustine v. Dep't of Veterans Affairs*, 429 F.3d 1334, 1340 (Fed. Cir. 2005) (also noting that "states cannot regulate practice before the PTO"). Whereas in *Kroll* the issue was the conduct of an attorney whose qualifications were not in dispute, in *Augustine* and *Sperry* the states' licensing requirements were at issue. Even under the limited field of preemption identified in *Kroll*, "the PTO has the exclusive authority to establish qualifications for admitting persons to practice before it," and states "may not

impose additional licensing requirements beyond those required by federal law to permit a non-lawyer patent agent to practice before the PTO." *Kroll*, 242 F.3d at 1364.

Here, the issue is whether Missouri can prohibit non-lawyers from practicing law before the PTO. Under *Sperry*, *Kroll*, and *Augustine*, Missouri cannot do so. Even though there is no evidence that LegalZoom is licensed to practice before the PTO, that field of regulation is occupied by federal law. With respect to patent and trademark applications, federal law preempts Plaintiffs' claims. Therefore, the Court grants Defendant's Motion for Summary Judgment with respect to Plaintiffs' claims as they relate to patent and trademark applications.

## E.     Plaintiffs' Motions

Plaintiffs' Motion for Partial Summary Judgment is limited to a single issue: whether the papers, documents, or instruments at issue here affect or relate to secular rights. As explained above, Missouri's unauthorized practice of law statute defines the "law business" as including "the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights . . . ." Mo. Rev. Stat. § 484.010.2.

Defendant LegalZoom characterizes this motion as focused on "a single tangential and ultimately irrelevant issue." [Doc. # 112 at 9.] Defendant points out that, as discussed above, the Missouri Supreme Court "requires that the statute's meaning must be informed by Missouri case law." *Id.* at 12. Indeed, in the above discussion, Missouri cases have

informed the Court's reading of Missouri's unauthorized practice of law statute. As explained above, the application of the statute to LegalZoom's legal document preparation service is consistent with the Missouri judiciary's regulation of the practice of law. *See Eisel*, 230 S.W.3d at 339.

*Black's Law Dictionary* defines "secular" as "Not spiritual; not ecclesiastical; relating to affairs of the present (temporal) world." *Black's Law Dictionary* 1353 (6th ed. 1990). Plaintiffs cite various cases in which courts from other jurisdictions have interpreted "secular" as meaning rights that are not religious in nature. *See Books v. City of Elkhart*, 235 F.3d 292, 302 (7th Cir. 2000); *Espinosa v. Rusk*, 634 F.2d 477, 479 (10th Cir. 1980); *In re Westboro Baptist Church*, 189 P.3d 535, 548-49 (Kan. Ct. App. 2008).

Defendant LegalZoom does not maintain that the documents at issue here affect religious rights. However, LegalZoom does maintain that the documents "do not affect any rights at all before the customers themselves sign, execute, and (in some cases) file them." [Doc. # 112 at 11.]

Defendant's argument on this narrow point does not withstand scrutiny. The statute prohibits, inter alia, "assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights . . . ." Mo. Rev. Stat. § 484.010.2. In other words, there is no requirement that secular rights be affected the moment the document is produced. If that were the case, then the non-lawyers in *Eisel*, *Carpenter*, and *Hulse* could have simply left the room before the legal documents were signed to avoid

Missouri's regulation of the practice of law. Moreover, the paper, document, or instrument can either affect or relate to secular rights.

Because Defendant fails to rebut Plaintiffs' claim that the papers, documents, or instruments at issue here "affect[ ] or relat[e] to secular rights," *id.* – which is quite clear, based on the undisputed facts – the Motion for Partial Summary Judgment is granted. Although Defendant objects that this motion is procedurally inappropriate, it has reduced the number of potential issues for trial.

Additionally, Plaintiffs' Motion to Strike LegalZoom's Summary Judgment Facts 45 through 79 [Doc. # 114] and Motion to Exclude Expert Testimony [Doc. # 86] are denied as they relate to the Motion for Summary Judgment.

## III.    Conclusion

Accordingly, it is hereby ORDERED that Defendant LegalZoom's Motion for Summary Judgment [Doc. # 100] is GRANTED with respect to Plaintiffs' claims as they relate to patent and trademark applications and DENIED in all other respects. Plaintiffs' Motion for Partial Summary Judgment [Doc. # 88] is GRANTED, and the Motion to Strike [Doc. # 114] and Motion to Exclude Expert Testimony [Doc. # 86] are DENIED as they relate to the Motion for Summary Judgment.

                                         s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
Dated:  August 2, 2011                  United States District Judge
Jefferson City, Missouri